Junji YAMAMOTO, Appellant,

v.

U.S. PAROLE COMMISSION, Appellee.

Junji YAMAMOTO, Appellant,

v.

U.S. PAROLE COMMISSION; U.S. Attorney General and Joseph S. Petrovsky, Warden, U.S. Medical Center for Federal Prisoners, Appellees.

No. 85–1289.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 15, 1985.

Decided June 27, 1986.

Donald E. Miller, Kansas City, Mo., for appellant.

David C. Jones, Asst. U.S. Atty., Springfield, Mo., for appellee.

Before LAY, Chief Judge, HENLEY, Senior Circuit Judge, and JOHN R. GIBSON, Circuit Judge.

PER CURIAM.

Junji Yamamoto, a federal prisoner, appeals the denial of his petition for a writ of habeas corpus, claiming that the United States Parole Commission's use of parole guidelines promulgated after the commission of his crime to determine his parole eligibility violates the constitutional prohibition against ex post facto laws. The district court[1] held that the federal parole guidelines are not laws and that the ex post facto clause thus does not apply. As we are convinced the ex post facto clause is not applicable, we affirm.

Yamamoto was sentenced on July 16, 1982, to a seven-year term of imprisonment (eighty-four months) for conspiracy to import and distribute heroin from 1976 through 1979. Yamamoto had his initial parole hearing before a panel of United States Parole Commission hearing examiners on March 24, 1983. Applying the 1983 paroling policy guidelines set forth at 28 C.F.R. § 2.20 (1983), the panel determined that Yamamoto was a very good parole risk and assigned him a salient factor score of ten out of ten. The panel rated Yamamoto's offense behavior as category eight severity because it involved a conspiracy to import and distribute more than three kilograms of heroin of one hundred percent purity in which Yamamoto had a managerial and proprietary interest. The 1983 parole guidelines provided that an offender with a salient factor score of ten and an offense severity rating of eight should be expected to serve one hundred or more months before release. After determining that a decision outside the guidelines was not warranted in this case, the panel informed Yamamoto that he would continue serving to the expiration of his eighty-four month sentence minus good-time reductions, resulting in a term of imprisonment of fifty-six months.[2]

After exhausting his administrative appeals, Yamamoto filed a petition for writ of habeas corpus with the United States District Court, contending that the application of the 1983 parole guidelines to an offender convicted of a crime that occurred from 1976 through 1979 violated the ex post facto clause of the United States Constitution, U.S. Const. art. I, § 9, cl. 3. A United States magistrate issued a report recommending dismissal of Yamamoto's petition on the grounds that the federal parole guidelines are not laws within the meaning of the ex post facto clause. The district court overruled Yamamoto's exceptions to the magistrate's report and, adopting its rationale, dismissed Yamamoto's petition.[3] This appeal followed.

---

1. The Honorable William R. Collinson, Senior United States District Judge for the Eastern and Western Districts of Missouri.

2. Parole eligibility determinations are made without reference to the credits an offender has earned for good-time served. *Briggs v. United*

*States Parole Commission,* 736 F.2d 446, 449 (8th Cir.1984).

3. Contrary to the magistrate's recommendation, the district court granted Yamamoto leave to proceed in forma pauperis because it determined that the issue of whether the federal parole eligibility guidelines constitute laws un-

■ The Constitution prohibits Congress from passing any law that "makes an action done before the passing of the law, and which was innocent when done, criminal; * * * [or] changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed." *Calder v. Bull,* 3 U.S. (3 Dall.) 386, 390, 1 L.Ed. 648 (1798); *see* U.S. Const. art. I, § 9, cl. 3.[4] The ex post facto clause serves both to curtail legislative abuses and to give fair warning of criminal laws and their punishments. *Weaver v. Graham,* 450 U.S. 24, 29, 101 S.Ct. 960, 964, 67 L.Ed.2d 17 (1981). A law violates the ex post facto clause if it applies retrospectively to events occurring before its enactment and if it is more onerous than the law in effect on the date of the offense. *Id.* at 30–31, 101 S.Ct. at 965–66.

While the 1983 guidelines are prospective in the sense that they relate to parole discretion to be exercised after their effective date, it is undisputed that application of the 1983 parole guidelines to determine Yamamoto's parole eligibility fulfills the retrospectivity requirement of *Weaver v. Graham* because the 1983 guidelines were not in effect in 1979, the last year of Yamamoto's conspiracy.[5] Yamamoto also argues that the 1983 guidelines are more onerous than the 1979 guidelines in effect when he committed his crime. For an offender with his salient factor score and offense severity rating, Yamamoto contends, the 1979 guidelines recommended a term of imprisonment of forty to fifty-two months before parole, whereas the 1983 guidelines recommend that such an offender serve one hundred or more months before release. Based on the 1983 guidelines, the parole panel determined that Yamamoto should serve his full eighty-four month sentence less good-time reductions, a total of fifty-six months. Thus, Yamamoto contends, the panel's use of the 1983 guidelines to make his parole determination violated the ex post facto clause because he received a more onerous punishment than he would have received under the guidelines in effect at the time of his crime.

We conclude that there is no ex post facto violation. Our holding that in the circumstances of this case retrospective application of the federal parole guidelines does not offend the ex post facto clause is supported by an impressive line of authority. Eight other circuits and one Supreme Court justice have reached a similar result, although they have not always agreed on the rationale.[6] The majority of these courts have held, as the district court did in this case, that the federal parole guidelines are not "laws" within the meaning of the ex post facto clause and that the ex post facto clause thus does not apply.[7] Other

der the ex post facto clause is one of first impression in the Eighth Circuit.

4. The Constitution also prohibits states from passing ex post facto laws. U.S. Const. art. I, § 10, cl. 1.

5. In *Hayward v. United States Parole Commission,* 659 F.2d 857, 862 (8th Cir.1981), *cert. denied,* 456 U.S. 935, 102 S.Ct. 1991, 72 L.Ed.2d 454 (1982), we held that an ex post facto analysis focuses on the law in effect on the date of the offense, rather than on the law in effect at the time of sentencing.

6. *See Portley v. Grossman,* 444 U.S. 1311, 1312–13, 100 S.Ct. 714, 715, 62 L.Ed.2d 723 (1980) (in chambers opinion of Rehnquist, Circuit Justice denying stay of execution pending review on certiorari of Ninth Circuit's denial of a writ of habeas corpus); *United States ex rel. Forman v. McCall,* 776 F.2d 1156, 1163 (3d Cir.1985); *Inglese v. U.S. Parole Commission,* 768 F.2d 932 at 935–36 (7th Cir.1985); *DiNapoli v. Northeast Re-*

*gional Parole Commission,* 764 F.2d 143, 146 (2d Cir.), *cert. denied,* —— U.S. ——, 106 S.Ct. 568, 88 L.Ed.2d 553 (1985); *Dufresne v. Baer,* 744 F.2d 1543, 1549–50 (11th Cir.1984), *cert. denied,* —— U.S. ——, 106 S.Ct. 61, 88 L.Ed.2d 49 (1985); *Roth v. United States Parole Commission,* 724 F.2d 836, 840 (9th Cir.1984); *Stroud v. United States Parole Commission,* 668 F.2d 843, 847 (5th Cir.1982); *Warren v. United States Parole Commission,* 659 F.2d 183, 193–97 (D.C.Cir. 1981), *cert. denied,* 455 U.S. 650, 102 S.Ct. 1454, 71 L.Ed.2d 665 (1982); *Ruip v. United States,* 555 F.2d 1331, 1335–36 (6th Cir.1977).

7. *See Inglese,* 768 F.2d at 935–36; *DiNapoli,* 764 F.2d at 146; *Dufresne,* 744 F.2d at 1549–50; *Roth,* 724 F.2d at 840; *Ruip,* 555 F.2d at 1335–36; *see also United States ex rel. Forman v. McCall,* 776 F.2d at 1163 (although initially holding that federal parole guidelines might be deemed "laws" under the ex post facto clause if the Parole Commission applies those guidelines inflexibly, *see United States ex rel. Forman v.*

courts have found that the guidelines merely rationalize the exercise of statutory discretion and that retrospective application of the guidelines thus does not violate the ex post facto clause.[8] Some of these cases have held, in the alternative, that the retrospective application of the guidelines does not result in a more onerous punishment and thus does not violate the ex post facto clause.[9]

Congress has for many years delegated the power to parole federal prisoners to the United States Parole Commission, known until 1976 as the United States Board of Parole.[10] The Board considered federal prisoner parole applications without reference to written guidelines until 1972. Then, in response to criticisms that parole decisions were eratic and inconsistent, the Board began to experiment with the use of written guidelines to structure its decision-making process. To accommodate these and other changes in the federal parole system, Congress enacted the Parole Commission and Reorganization Act in 1976, ch. 311, 90 Stat. 219 (codified as amended at 18 U.S.C.A. §§ 4201–4218 (West 1985)). The Act replaced the Board with the Commission, clarified the structure of the parole process, and required the Commission to promulgate and use written guidelines in making parole decisions.

In *Hayward v. United States Parole Commission*, 659 F.2d 857 (8th Cir.1981), *cert. denied*, 456 U.S. 935, 102 S.Ct. 1991, 72 L.Ed.2d 454 (1982), we considered whether the use of the newly promulgated parole guidelines to determine the parole eligibility of an offender convicted of a crime that occurred prior to the adoption of the parole guidelines violated the ex post facto clause. Although we expressly declined to decide whether the federal parole guidelines are laws within the meaning of the ex post facto clause, we determined that the parole system in effect at the time the crime was committed (1970–1971) did

---

*McCall*, 709 F.2d 852, 859–62 (3d Cir.1983), concluding on consideration after remand that as a factual matter, the guidelines are applied with "substantial flexibility" and thus do not constitute "laws").

This court has declined to determine, or found it unnecessary to consider, whether the federal parole guidelines constitute "laws" within the meaning of the ex post facto clause on three occasions. *See Rush v. Petrovsky*, 756 F.2d 675 (8th Cir.1985) (per curiam); *Richardson v. United States Parole Commission*, 729 F.2d 1154, 1156 n.1 (8th Cir.1984) (per curiam); *Hayward v. United States Parole Commission*, 659 F.2d 857, 862 (8th Cir.1981), *cert. denied*, 456 U.S. 935, 102 S.Ct. 1991, 72 L.Ed.2d 454 (1982). Instead, in each of those cases, we determined that the federal parole guidelines did not result in a more onerous punishment.

**8.** *See Portley*, 444 U.S. at 1312, 100 S.Ct. at 715; *Warren v. U.S. Parole Commission*, 659 F.2d 183 at 195 (D.C.Cir.1981). The Sixth Circuit merely held without further elaboration that "[t]here is no *ex post facto* violation in the retroactive application of the guidelines." *Stroud*, 668 F.2d at 847.

**9.** *See Dufresne*, 744 F.2d at 1549–50; *Warren*, 659 F.2d at 193; *Raifai v. United States Parole Commission*, 586 F.2d 695, 698–99 (9th Cir. 1978).

The Supreme Court has twice expressly declined to consider whether retrospective application of the federal parole guidelines violates the ex post facto clause. *See United States Parole Commission v. Geraghty*, 445 U.S. 388, 390 n.1, 408, 100 S.Ct. 1202, 1205 n. 1, 1214–15, 63 L.Ed.2d 479 (1980); *United States v. Addonizio*, 442 U.S. 178, 184, 99 S.Ct. 2235, 2239–40, 60 L.Ed.2d 805 (1979). In each of those cases, the Court found it unnecessary to address any part of the ex post facto issue.

**10.** Parole Commission and Reorganization Act, ch. 311, 90 Stat. 219 (1976) (codified as amended at 18 U.S.C.A. §§ 4201–4218 (West 1985)) (repealing and replacing Act of June 25, 1948, P.L. 80–722, ch. 311, §§ 4201–4207, 62 Stat. 683, 854–55, and Act of Aug. 25, 1958, P.L. 85–752, §§ 3–5, 72 Stat. 845–47 (both codified as amended at 18 U.S.C. §§ 4201–4209 (1970)) (repealed 1976)).

The Sentencing Reform Act of 1984 abolishes the parole system and replaces the current sentencing process with a system of sentencing guidelines, effective November 1, 1986. P.L. 98–473, tit. II, ch. II, 98 Stat. 1987; *id.* at § 218(a)(5), 98 Stat. 2027 (repealing chapter 311, currently codified as amended at 18 U.S. C.A. §§ 4201–4218 (West 1985)). The Parole Commission and current law provisions relating to parole are to remain in effect for five years after the effective date of the Sentencing Reform Act as to any individual convicted of an offense before the effective date of the Act in order to deal with sentences imposed under current sentencing practices. *Id.* § 235(b)(1), 98 Stat. 2032.

not give the defendant any expectation of a particular parole system. *Id.* at 862.[11] We therefore held that the retrospective application of the parole guidelines did not violate the ex post facto clause. *Id.* Implicit in this holding was a finding that, because an offender had no expectation, aside from the constraints imposed by the sentencing judge, as to the length of time he or she would serve before parole prior to the adoption of the written guidelines, the adoption of the written guidelines could not result in a more onerous punishment. While *Hayward, supra,* and *Richardson v. United States Parole Commission,* 729 F.2d 1154 (8th Cir.1984), expressly declined to decide whether the federal parole guidelines are laws within the meaning of the ex post facto clause and *Rush v. Petrovsky,* 756 F.2d 675 (8th Cir.1985), found it unnecessary to consider this issue, we are favorably impressed with the holdings of the several circuits that have so concluded. *See supra* n. 7. We are also persuaded, however, that it is unnecessary to reach this issue in this case as we are satisfied that Yamamoto had no expectation of a particular parole system at the time the crime was committed, *Hayward,* 659 F.2d at 862, and that the new guidelines were not more onerous than the old. Accordingly, once again we need not specifically address this issue.

Of importance here is the question whether Congress, in enacting the Parole Commission and Reorganization Act of 1976, so substantially reduced the Commission's discretion over parole decisions that a prisoner now has an expectation that in making parole decisions the Commission will adhere more firmly to the guidelines.

Only then would an upward revision of the guidelines possibly result in a more onerous punishment.[12]

Although the parole guidelines were intended to reduce the disparity of prison terms for like offenders and offenses, S.Rep. No. 369, 94th Cong., 2d Sess. 18, *reprinted in* 1976 U.S.Code. Cong. & Ad.News 335, 339–40, Congress clearly intended that parole eligibility determinations would remain a matter of discretion with the Parole Commission. For example, 18 U.S.C. 4206(c) provides that "[t]he Commission may grant or deny release on parole notwithstanding the guidelines referred to in subsection (a) of this section if it determines there is good cause for so doing." The legislative history of the 1976 Parole Commission and Reorganization Act confirms that Congress intended the Parole Commission to continue to make parole determinations on an individual basis in light of the "nature and circumstances of the offense and the history and characteristics of the prisoner." H.R.Rep. No. 838, 94th Cong., 2d Sess. 19, 26, *reprinted in* 1976 U.S.Code Cong. & Ad.News 351, 358; *see also id. passim.*

Moreover, the regulations promulgated by the Parole Commission clearly indicate that the guidelines are merely guides to agency discretion rather than rigid rules. For example, the statement of general policy preceeding the guidelines provides in pertinent part:

(a) To establish a national paroling policy, promote a more consistent exercise of discretion, and enable fairer and more equitable decision-making without remov-

---

11. The statute in effect at the time Hayward committed his offense provided in pertinent part:

If it appears to the Board of Parole from a report by the proper institutional officers or upon application by a prisoner eligible for release on parole, that there is a reasonable probability that such prisoner will live and remain at liberty without violating the laws, and if in the opinion of the Board such release is not incompatible with the welfare of society, the Board may *in its discretion* authorize the release of such prisoner on parole.

18 U.S.C. § 4203(a) (1970) (emphasis added) (repealed 1976).

12. Here the Commission observes that, since Yamamoto's offense involved smuggling more than sixty times the amount of heroin listed in the "Greatest I" category of the 1979 guidelines, the Commission probably would have imposed a parole decision above that guideline. Thus, the Commission argues, there is no showing in fact that a more onerous burden under the 1983 guidelines has resulted.

ing individual case consideration, the United States Parole Commission has adopted guidelines for parole release consideration.

(b) These guidelines indicate the customary range of time to be served before release for various combinations of offense (severity) and offender (parole prognosis) characteristics. The time ranges specified by the guidelines are established specifically for cases with good institutional adjustment and program progress.

(c) These time ranges are merely guidelines. Where the circumstances warrant, decisions outside of the guidelines (either above or below) may be rendered.

28 C.F.R. § 2.20(a), (b) & (c) (1983). Finally, both the legislative history of the statute authorizing the guidelines and the Parole Commission regulations recognize that the guidelines should be periodically reviewed and revised or modified if decisions frequently go above or below the guidelines' recommendations. H.R.Rep. No. 838 at 27, *reprinted in* 1976 U.S.Code Cong. & Ad.News at 360; 28 C.F.R. § 2.20(g) (1983). Offenders are thus given fair warning that the guidelines governing parole determinations are subject to change. *See Inglese v. United States Parole Commission,* 768 F.2d 932, 936 (7th Cir.1985); *see also Weaver v. Graham,* 450 U.S. 24, 30, 101 S.Ct. 960, 965, 67 L.Ed.2d 17 (1981) ("Critical to relief under the *Ex Post Facto* Clause is not an individual's right to less punishment but the *lack of fair notice* and governmental restraint when the legislature increases punishment beyond what was prescribed when the crime was consummated") (emphasis added). In short:

The statute, the parole regulations, and the policy statements contained therein clearly and repeatedly emphasize the discretionary aspect of the decision-making process of parole, particularly in the use of the guidelines. While a heightened standard of review checks this discretion, the Commission's inherent ability to exercise discretion is not thereby altered.

*Inglese,* 768 F.2d at 936. In light of Congress' clearly expressed intent that the guidelines would not significantly restrict the Parole Commission's discretion in determining the *length* of time a prisoner should serve before parole, we hold that the Parole Commission's use of the 1983 federal parole guidelines in making Yamamoto's parole determination did not result in a more onerous punishment. Accordingly, retroactive application of the guidelines does not violate the ex post facto clause.

In holding that application of the 1983 federal parole guidelines to Yamamoto does not violate the ex post facto clause, we are aware of some limits to our decision. Our decision does not rest on the fact that the guidelines were promulgated by an agency rather than by Congress itself. Clearly, Congress may not, by delegation, escape constitutional limitations on its power. *See McCall,* 709 F.2d 852, 859 (3d Cir.1983), *appeal after remand,* 776 F.2d 1156 (3d Cir.1985); *Inglese,* 768 F.2d at 935. If Congress would be prevented by the ex post facto clause from retroactively revising guidelines of the type involved here, so too would an agency acting pursuant to congressional mandate. We recognize that some aspects of the parole process, while a matter of discretion, are such that a change in the parole process could violate the ex post facto clause. For example, retrospective application of a statute or rule altering the method for computing "gain time for good conduct" to an inmate who committed a crime before the enactment of the alteration clearly violates the ex post facto clause. *Weaver v. Graham,* 450 U.S. 24, 35–36, 101 S.Ct. 960, 967–68, 67 L.Ed.2d 17 (1981). Adverse changes in the frequency with which a prisoner may be *considered* for parole or in the time at which a prisoner first becomes *eligible for parole consideration* may also violate the ex post facto clause. *See United States ex rel. Graham v. United States Parole Commission,* 629 F.2d 1040, 1043 (5th Cir. 1980) (adverse change in frequency of parole hearing); *Rodriquez v. United States Parole Commission,* 594 F.2d 170, 175–76

(7th Cir.1979) (adverse change in time at which prisoner becomes eligible for parole consideration).

From what has been said, it follows that the judgment of the district court is affirmed.

LAY, Chief Judge, dissenting.

I respectfully dissent.

The Supreme Court has made it clear that changes affecting parole decisions are within the purview of the ex post facto clause. In finding that the "no parole" provision of a statute was part of the offender's punishment, the Court noted in *Warden v. Marrero*, 417 U.S. 653, 94 S.Ct. 2532, 41 L.Ed.2d 383 (1974), that "only an unusual prisoner could be expected to think that he was not suffering a penalty when he was denied eligibility for parole" and that "repealer of parole eligibility previously available to imprisoned offenders would clearly present the serious question under the *ex post facto* clause ... of whether it imposed a 'greater or more severe *punishment* than was prescribed by law at the time of the ... offense.'" *Id.* at 662–63, 94 S.Ct. 2538 (quoting *Rooney v. North Dakota*, 196 U.S. 319, 325, 25 S.Ct. 264, 265–66, 49 L.Ed. 494 (1905) (emphasis and omission in *Warden* )). That changes in parole eligibility can violate the ex post facto clause is also clear in *Weaver v. Graham*, 450 U.S. 24, 101 S.Ct. 960, 67 L.Ed.2d 17 (1981). The issue in *Weaver* was whether the application of a statute altering the method for computing "gain time" for good conduct to an inmate who committed a crime before enactment of the change violated the ex post facto clause. The Court first determined that regardless of whether the prospect of gain time was in some technical sense part of the offender's sentence, the statute substantially altered the consequences attached to a crime already completed, changing the quantum of punishment, and thus could be constitutionally

applied to offenders who committed crimes prior to enactment of the new statute only if it did not have a more onerous effect. *Id.* at 32–33, 101 S.Ct. at 966–67. The Court then determined that the new statute had a more onerous effect because it reduced the amount of gain time that could be earned for good conduct, thus lengthening the period that the offender had to spend in prison. *Id.* at 35–36, 101 S.Ct. at 967–68. *Weaver* makes it clear that retroactive changes to the parole process such as the change involved in this case violate the ex post facto clause.

Several courts have attempted to distinguish *Weaver* from cases involving retroactive application of the federal parole guidelines. These cases observe that in *Weaver*, the gain time credits for good conduct were automatic provided the offender avoid disciplinary infractions and perform assigned tasks, whereas in the case of the federal parole guidelines, the ultimate parole decision rests in the discretion of the Parole Commission. *See, e.g., Inglese v. United States Parole Commission*, 768 F.2d 932, 938 (7th Cir.1985). I find this a fragile distinction. The Court in *Weaver* expressly rejected the notion that a change in law can violate the ex post facto clause only if the change impairs a "vested right." The Court stated, "When a court engages in *ex post facto* analysis, which is concerned solely with whether a statute assigns more disadvantageous criminal or penal consequences to an act than did the law in place when the act occurred, it is irrelevant whether the statutory change touches any vested rights." *Weaver*, 450 U.S. at 29–30 n. 13, 101 S.Ct. at 964–65 n. 13.

Moreover, although Congress intended that the Parole Commission would retain discretion in making parole decisions, the Parole Commission and Reorganization Act places substantial constraints on the Commission's exercise of it's discretion.[1] Prior

---

1. As this court stated in *Edwards v. United States*, 574 F.2d 937 (8th Cir.), *cert. dismissed*, 439 U.S. 1040, 99 S.Ct. 643, 58 L.Ed.2d 700 (1978):

The goals of the guideline system are (1) to reduce the disparity in sentences meted out to similar offenders committing identical offenses, and (2) to contribute more predictability and fairness to Parole Board determina-

to the adoption of the Act, the Parole Board was vested with almost unlimited discretion in making parole determinations.[2] Under the Act, however, the Parole Commission is required to promulgate written parole guidelines, 18 U.S.C. § 4203(a)(1), and to make parole decisions "pursuant to" those guidelines, 18 U.S.C. § 4206(a)(2).[3] Although the Commission "may grant or deny release on parole notwithstanding the guidelines," it may deviate from the guidelines only if it "determines there is good cause for so doing"[4] and furnishes the offender "written notice stating with particularity the reasons for its determination, including a summary of the information relied upon." 18 U.S.C. § 4206(c). Although individual parole determinations are "committed to agency discretion," 18 U.S.C. § 4218(d), and therefore reviewable only for abuse of discretion, courts have held that the Commission must exercise its discretion in a manner consistent with the federal Constitution, applicable statutes, and its own published rules. *Edwards v. United,* 574 F.2d 937, 942 (8th Cir.1978); *see also Briggs v. United States Parole Commission,* 736 F.2d 446, 450 (8th Cir.1984); *Joost v. United States Parole Commission,* 698 F.2d 418, 419 (10th Cir. 1983) (per curiam). This court has also made it clear that when the Parole Commission exceeds the guidelines, it must clearly state its reasons for determining that "good cause" exists for deviating from the guidelines and those reasons must be prop-

er considerations under the applicable statutes and regulations. *Briggs,* 736 F.2d at 450; *see also Joost,* 698 F.2d at 419. Thus, although the Act does not eliminate the Commission's discretion over parole decisions, the requirement that the Commission promulgate and use written guidelines in making parole determinations significantly curtails that discretion.

A review of the facts of this case clearly illustrates that retroactive application of the 1983 parole guidelines to Yamamoto had a more onerous result. Based on the 1983 guidelines, which recommended that an offender with Yamamoto's salient factor score and offense severity rating serve one hundred or more months before release, the parole panel determined that Yamamoto should serve his full eighty-four month sentence less good time reductions. The 1979 guidelines in effect when Yamamoto committed his crime, however, recommended that an offender such as Yamamoto serve only forty to fifty-two months before parole. The Parole Commission could have required Yamamoto to serve his full eighty-four month sentence only if the panel had determined that there was "good cause" for an upward deviation from the guidelines. 18 U.S.C. § 4206(c). It is, in my judgment, difficult to rationalize that the 1983 parole guidelines are not therefore more onerous in this case.

The analogy to *Weaver* is readily apparent. Because the statute in effect at the

---

tions. It is clear that the guidelines do carry great, if not overwhelming, weight in Parole Board determinations.
*Edwards,* 574 F.2d 942–43 (footnote omitted).

**2.** The prior statute authorizing the Parole Board to make parole decisions is set out in footnote 11 of the majority opinion.

**3.** Section 4206(a) provides:
If an eligible prisoner has substantially observed the rules of the institution or institutions to which he has been confined, and if the Commission, upon consideration of the nature and circumstances of the offense and the history and characteristics of the prisoner, determines:
(1) that release would not depreciate the seriousness of his offense or promote disrespect for the law; and

(2) that release would not jeopardize the public welfare; subject to the provisions of subsections (b) and (c) of this section, and pursuant to guidelines promulgated by the Commission pursuant to section 4203(a)(1), such prisoner shall be released.
18 U.S.C. § 4206(a).

**4.** "For the purposes of this section 'good cause' means substantial reason and includes only those grounds put forward by the Commission in good faith and which are not arbitrary, irrational, unreasonable, irrelevant or capricious." H.R.Rep. No. 838, 94th Cong., 2d Sess. 19, 27, *reprinted in* 1976 U.S. Code Cong. & Ad. News 351, 359.

time Yamamoto committed his crime specified that Yamamoto would receive a parole decision within the parole guidelines unless there was "good cause" for a different result, as in *Weaver*, the retroactive change increased the likelihood that Yamamoto would have to serve more time in prison before release, thus resulting in a more onerous punishment. To say that the 1983 guidelines did not have a more onerous result in this case because the Parole Commission could have required Yamamoto to serve his full eighty-four month sentence under the 1979 guidelines had it determined that "good cause" existed for exceeding those guidelines ignores the admonition in *Weaver* that it is irrelevant that the same result *might* have been possible under another provision. *Weaver*, 450 U.S. at 34–36, 101 S.Ct. at 967–68. Thus, *Weaver* refutes the Commission's argument, and the majority's reference to this argument,[5] that Yamamoto might have received a parole decision outside the 1979 guidelines. In any event, such an argument is mere speculation.

Prior decisions of this circuit holding that retroactive application of the parole guidelines did not result in a more onerous punishment in those particular cases are clearly distinguishable. In fact, these cases illustrate that use of the 1983 parole guidelines to determine Yamamoto's release date had a more onerous effect. As the majority notes, the issue in *Hayward* was whether the use of the newly promulgated guidelines to determine the parole eligibility of an offender who committed a crime *prior to* the adoption of the guidelines violated the ex post facto clause. Because *Hayward* had no expectation as to the *length* of time he would serve before parole at the time he committed his crime, it was clear

that adoption and use of the written guidelines did not result in a more onerous punishment. In contrast, at the time Yamamoto committed his crime, written parole guidelines were in effect and specified the length of time an offender such as Yamamoto would be required to serve before parole absent good cause for a deviation.[6]

*Richardson v. United States Parole Commission*, 729 F.2d 1154 (8th Cir.1984) (per curiam), is also distinguishable. In *Richardson*, we considered whether the ex post facto clause barred application of the 1980 federal parole guidelines to an offender who committed a crime at the time the 1976 guidelines were in effect. The 1976 guidelines recommended that an offender such as Richardson serve a minimum of seventy-two months before parole, whereas the 1980 guidelines recommended that such a prisoner serve one hundred or more months before parole. Applying the 1980 guidelines, the Parole Commission determined that Richardson should serve eighty-seven months before parole. Because a term of imprisonment of eighty-seven months prior to parole was fully contemplated by the 1976 guidelines, we held that use of the 1980 guidelines did not result in a more onerous punishment and thus did not violate the ex post facto clause. *Richardson*, 729 F.2d at 1155; *see also Rush v. Petrovsky*, 756 F.2d 675 (8th Cir.1985) (per curiam) (use of 1983 guidelines, recommending parole after fifty-two to sixty-four months, to determine parole eligibility of offender who committed crime in 1982, when 1982 guidelines recommending parole after thirty-six to forty-eight months were in effect, was not more onerous where Parole Commission determined offender should serve forty to forty-seven months

---

5. See footnote 12 of the majority opinion.

6. The majority asserts that because the legislative history of the Parole Commission and Reorganization Act and the Parole Commission regulations state that the guidelines should be revised or modified if deviations from the guidelines are frequent, an offender has no expectation that the parole guidelines in effect at the time of the offense will be used to determine the offender's parole eligibility. This is a makeshift

argument. It suggests that Congress or an agency may avoid the constitutional prohibition against ex post facto laws merely by adding to the statute or rule that it is subject to revision. All laws are subject to revision, and merely because one is put on notice of this obvious fact does not destroy a person's expectation of having his or her conduct viewed under the law existing at the time of the crime.

before parole).[7] By contrast, under the 1979 guidelines, Yamamoto could not have received the parole determination he did unless there was "good cause" for exceeding the guidelines. The 1983 guidelines thus clearly had a more onerous result than the guidelines in effect when Yamamoto committed his crime.

Although the majority seemingly finds it unnecessary to consider whether or not the federal parole guidelines are laws,[8] in view of my conclusion that the guidelines have a more onerous result in this case, I address this issue. In concluding that the federal parole guidelines are not laws, some courts have relied on the fact that the guidelines were promulgated by an agency rather than by Congress itself.[9] I strongly disagree with this implication. As the majority correctly notes, Congress may clearly not, by delegation, escape constitutional limitations on its power.[10]

Other courts have relied on the fact that the Parole Commission retains substantial discretion in making parole determinations notwithstanding the guidelines.[11] These cases, however, do not cite any authority for the novel proposition that guidelines promulgated pursuant to congressional mandate are not laws merely because the

7. The court required Richardson to show "that he would have received a more favorable parole determination under the 1976 guidelines than he received under the 1980 guidelines." *Richardson*, 729 F.2d at 1155. In determining that a retroactive change in the sentence for a particular crime from a discretionary term of six months to fifteen years to a mandatory sentence of fifteen years violated the ex post facto clause, however, the Supreme Court held in *Lindsey v. Washington*, 301 U.S. 397, 57 S.Ct. 797, 81 L.Ed. 1182 (1937):

> It is true that petitioners might have been sentenced to fifteen years under the old statute. *But the* ex post facto *clause looks to the standard of punishment prescribed by a statute, rather than to the sentence actually imposed* .... It is for this reason that an increase in the *possible* penalty is *ex post facto,* ... regardless of the length of the sentence *actually* imposed, since the measure of punishment prescribed by the later statute is more severe than that of the earlier, ....

*Id.* at 401, 57 S.Ct. at 799 (emphasis added) (citations omitted). In interpreting *Lindsey*, the Supreme Court recently stated,

> We think the excerpted language from *Lindsey* must be read in the light of these facts to mean that one is not barred from challenging a change in the penal code on *ex post facto* grounds simply because the sentence he received under the new law was not more onerous than that which he might have received under the old.

*Dobbert v. Florida*, 432 U.S. 282, 300, 97 S.Ct. 2290, 2302, 53 L.Ed.2d 344 (1977). These decisions strongly suggest that an ex post facto inquiry must focus on the overall effect of a change in law, rather than on the actual result of the change in the particular case. The validity of *Richardson* and *Rush* in light of these Supreme Court cases is thus highly questionable.

8. The majority approves decisions of other circuits that hold that the federal parole guidelines are not laws. See footnote 7 of the majority opinion. At the same time, the majority states that it does not decide this issue. The majority also states that "Congress may not by delegation escape constitutional limitations on its power." The majority's position is confusing because many of the decisions it approves rely on the specious reasoning that the federal parole guidelines are not passed by Congress. *See infra* note 9.

9. *See, e.g., Dufresne v. Baer*, 744 F.2d 1543, 1549–50 (11th Cir.1984), *cert. denied*, — U.S. ——, 106 S.Ct. 61, 88 L.Ed.2d 49 (1985) ("[The guidelines] are not promulgated by any legislature. Rather, they are stated policy rules that show how agency discretion is likely to be exercised."); *Ruip v. United States*, 555 F.2d 1331, 1336 (6th Cir.1977) (in distinguishing cases suggesting that retroactive changes in statutes affecting parole determinations might violate ex post facto clause, the court stated, "Since the relevant provisions were statutes, there was no question that they were encompassed in the prohibition on ex post facto laws. The situation here is different."); *see also Inglese*, 768 F.2d at 941 (Cudahy, J., concurring).

10. Promulgation of and changes to the guidelines are expressly subject to the rulemaking procedures of the Administrative Procedure Act notwithstanding the Parole Commission's designation of the guidelines as general statements of policy. *See* 18 U.S.C. § 4218(a)-(c) (1982).

11. *See, e.g., United States ex rel. Forman v. McCall*, 776 F.2d 1156, 1163 (3d Cir.1985); *Inglese*, 768 F.2d at 936; *DiNapoli*, 764 F.2d at 146–47; *Dufresne*, 744 F.2d at 1550. As one court stated, "The power to exercise discretion indicates that the guidelines are merely guides, and not laws: guides may be discarded where circumstances require; laws may not." *Inglese*, 768 F.2d at 936.

agency may deviate from the guidelines if there is "good cause" for doing so. This reasoning would have some merit if the guidelines merely provided a presumptive release date from which the Parole Commission could deviate at its *complete* discretion and if courts had absolutely no authority to review the Commission's parole determinations. The system of "checks" on the Commission's discretion in making parole decisions discussed above, however, is inconsistent with the notion that the guidelines are not laws.

I conclude therefore that (1) the 1983 guidelines are laws, which when applied retroactively, as in this case, are (2) more onerous than the guidelines in effect when Yamamoto committed his crime. Under the circumstances, Yamamoto deserves immediate release from prison, because to hold him incarcerated for any additional time is to deny him his constitutional right to be free from an ex post facto application of the law.